

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E.S. AND M.S. O/B/O B.S.,

                  Plaintiffs,

                  *v.*

KATONAH-LEWISBORO SCHOOL DISTRICT,

                  Defendant.

**09 Civ. 4770**

**ORDER AND OPINION**

**LORETTA A. PRESKA, Chief United States District Judge:**

    Plaintiffs, on behalf of their minor child, plaintiff student B.S., bring an action as against the defendant Katonah-Lewisboro School District ("the District" or "KLSD"), setting forth a claim for relief under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2). Both parties have made motions for summary judgment, which is the common procedural method in an IDEA action to request that the Court to decide the case on the basis of the administrative record. [1]

    Plaintiffs seek a reversal of the decision of the Impartial Hearing Officer ("IHO")—affirmed by the New York State Review Officer ("SRO")—that the defendant District had provided B.S. with a free appropriate public education ("FAPE") in the least restrictive environment ("LRE") for the 2006-2007 and 2007-2008 school years and denied Plaintiffs' request for tuition reimbursement for their unilateral placement of B.S. in a day program at the Maplewood School for those two school years. Defendants request that the Court affirm the

---

[1] Plaintiff successful petitioned the Court to supplement the record—therefore, additional items were also considered by the Court and are enumerated in full in the Order and Opinion issued on January 22, 2010. *See* Docket Entry 15.

decisions of the IHO and SRO.  For the following reasons, the Court finds in favor of Plaintiffs

for the 2007-2008 school year only, reverses the decisions of the IHO and SRO with respect to

that year, and awards tuition reimbursement to Plaintiffs for the 2007-2008 school year.

## I.    Legal Standard under IDEA

The IDEA was enacted to promote the education of children with disabilities.  *See Bd. of*

*Educ. v. Rowley*, 458 U.S. 176, 179 (1982).  Under the statute, "states receiving federal funds are

required to provide 'all children with disabilities' a 'free appropriate public education

[(FAPE)].'"  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (quoting

20 U.S.C. § 1412(a)(1)(A)); *Rowley*, 458 U.S. at 207.  To meet this requirement, the FAPE must

provide "special education and related services" tailored to meet the unique needs of the

particular child, 20 U.S.C. § 1401(a)(18), and be "reasonably calculated to enable the child to

receive educational benefits."  *Rowley*, 458 U.S. at 207.

The "centerpiece of the statute's education delivery system is the IEP [Individualized

Education Plan], an educational program tailored to provide appropriate educational benefits to

individual disabled students."  *Viola v. Arlington Cent. Sch. Dist.*, 414 F.Supp.2d 366, 377

(S.D.N.Y. 2006) (quotation omitted).  The IEP must be developed annually, by a "school official

qualified in special education, the child's teacher, the child's parents, and, where appropriate, the

child."  *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citing 20

U.S.C. § 1401(a)(20)).  An IEP is "a written statement that 'sets out the child's present education

performance, establishes annual and short-term objectives for improvements in that performance,

and describes the specially designed instruction and services that enable the child to meet those

objectives.'"  *D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.*, 465 F.3d 503, 508 (2d Cir. 2006)

(quoting *Honig v. DOE*, 484 U.S. 305, 311 (1988).

The law is clear that a school district is not required to "furnish . . . every special service necessary to maximize each handicapped child's potential," *Rowley*, 458 U.S. at 199, but rather "fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *Cerra v. Pawling Cent. Sch. Dist.*, 437 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130). Thus, the education provided must be "sufficient to confer some educational benefit upon the handicapped child," *Rowley*, 458 U.S. at 200, but it need not "provide[] everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (quotation omitted).

Another requirement under IDEA is that "special education and related services must be provided in the least restrictive setting consistent with a child's needs" since the "law expresses a strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, 20 U.S.C. § 1412(5)." *Walczak*, 142 F.3d at 122 (2d Cir. 1998).

In New York, responsibility for developing IEPs rests with local Committees on Special Education ("CSEs"), the members of which are appointed by school boards or the trustees of school districts. *Gagliardo*, 489 F.3d at 107. The CSE is required to consider four factors in developing an IEP: "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Id.* at 107-108. As discussed in *Walczak*, New York's regulations require that each child's IEP must identify a specific class placement, and noted:

3

Children may be grouped together in a special education class if they have "the same disabilities" or if they have "differing disabilities [but] ... similar individual needs for the purpose of being provided a special education program." 8 N.Y.C.R.R. § 200.1(jj); *see also* 8 N.Y.C.R.R. § 200.6(g)(3). Thus, the students in a class must have sufficiently similar academic levels and learning characteristics that each child will have the opportunity to achieve his or her annual goals. *See* 8 N.Y.C.R.R. § 200.6(a)(3)(i). A CSE must also strive to "assure that the social interaction within the group is beneficial to each student, contributes to each student's social growth and maturity, and does not consistently interfere with the instruction being provided." 8 N.Y.C.R.R. § 200.6(a)(3)(ii). Nevertheless, the regulation cautions that the "social needs of a student shall not be the sole determinant" of his or her class placement. *See id.*

*Walczak*, 142 F.3d at 123.

"[P]arents who disagree with their child's IEP may challenge it in an 'impartial due process hearing' before an IHO [impartial hearing officer] appointed by the local board of education." *Gagliardo*, 489 F.3d at 108 (citations omitted). The IHO's decision may be appealed to a State Review Officer ("SRO"), "and the SRO's decision in turn may be challenged in either state or federal court." *Id.* The district court may "receive the records of the administrative proceedings," as well as "hear additional evidence," and then "bas[e] its decision on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C). The Court granted Plaintiffs' request to supplement the record because the additional evidence was relevant, useful to the court, and not duplicative of the administrative record. Plaintiffs set forth persuasive and particularized reasons for each piece of evidence. The Court found that the evidence informed the Court's review without turning it into a full blown de novo trial. *See* Order and Opinion, issued January 22, 2010, Docket Entry 15; *see also Town of Burlington v. Dept. of Educ. for the Commonwealth of Mass.*, 736 F.2d 773 (1st Cir. 1984); *Eschenasy v. N.Y. City Dept. of Educ.*, 604 F.Supp.2d 639 (S.D.N.Y. 2009).

The civil action provision of IDEA has been construed to mean that the Court should

4

"give 'due weight' to the [state administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of education policy.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206). The district court's review has also been characterized as a "modified de novo" review. *M.H. v. N.Y. City Dept. of Educ.*, --- F.Supp.2d ----, 2010 WL 1904005, *2 (S.D.N.Y. May 10, 2010).

In fashioning a remedy, the court has "broad authority to grant 'appropriate' relief, including reimbursement for the cost of private special education when a school district fails to provide a FAPE." *Forest Grove Sch. Dist. v. T.A.,* --- U.S. ----, 129 S.Ct. 2484, 2492, 174 L.Ed.2d 168 (2009); *see Sch. Comm. of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (IDEA authorizes reimbursement).  When the parents seek reimbursement of expenses incurred at a private school, the court will grant an award in their favor if it appears "(1) that the proposed IEP was inadequate to afford the child an appropriate public education, and (2) that the private education services obtained by the parents were appropriate to the child's needs." *Walczak*, 142 F.3d at 129 (citing *School Comm. of Burlington v. Department of Educ. of Mass.,* 471 U.S. 359, 370, 105 S.Ct. 1996, 2002-03, 85 L.Ed.2d 385 (1985); *accord Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 12-14, 114 S.Ct. 361, 364-66, 126 L.Ed.2d 284 (1993) (the court may require state to reimburse parents for expenses incurred at a private school even though it is not on state-approved placement list)).

## II.    Factual Background

The parents of B.S., E.S. and M.S., requested an impartial hearing on December 7, 2007.

*See* Complaint, Ex. A, Impartial Hearing Final Decision ("IHO Decision"), at 1.[2]  Hearings were

held on February 4, February 11, March 5, April 2, April 3, May 8, May 16, May 27, May 28,

June 30, July 1, July 2, July 31, August 18, September 24, and October 21, 2008.  *Id.*  The school

district and parents placed over 130 documents into evidence, twelve witnesses testified, and

both parties submitted post-hearing briefs.  *Id.*  It is apparent from the record that the hearing was

exhaustive, and both parties had ample time to present evidence to support their positions.

Similarly, the SRO's 26-page single-spaced opinion is very thorough and specifically recounts

the objective evidence in the record to support his findings.  Below, the Court summarizes the

most relevant information gleaned from the ample administrative record and the supplementary

evidence submitted by Plaintiffs.

### a.  B.S.'s History

The student, B.S., was born on February 18, 1992.  He has been designated as a

"classified student" by the Katonah-Lewisboro School District ("KLSD") since he entered the

School District in 2002.  Before coming to KLSD, the student attended public elementary school

in another district and was primarily placed in a self-contained class for academic instruction and

related services.  (SD-2 at p. 5).  During the summer of 2002, just after the student's fourth grade

year, the student attended a "partial hospitalization program" at a psychiatric outpatient facility

"due to emotional difficulties accompanied by visual and auditory hallucinations" where he was

diagnosed with schizoaffective disorder, bipolar type and borderline intellectual functioning.

SD-2 at 5; SD-26; P-DD at 4.  He continued to take medication to regulate mood and improve

---

[2] Throughout the opinion, the Court cites to: the Impartial Hearing transcript ("Tr"); the exhibits submitted by the School District ("SD-x"); exhibits submitted by the parents ("P-x"); exhibits accumulated during the Impartial Hearing ("IHO-x"); the Impartial Hearing Decision ("IHO Decision"); the State Review Officer's Decision ("SRO Decision"); and the parties' briefs.  The Court will also cite to the parties' Rule 56.1 Statements as "Plt. 56.1" and "Deft. 56.1."

reality testing.  (Plt. 56.1 ¶ 17; SD-2 at 2).

From September 2002 through May 2004 (B.S.'s fifth and sixth grades), the student attended a State-approved private school as a day student in an 8:1+1 therapeutic special class and received counseling, occupational therapy, and speech language therapy.  (SD-21; P-DD at 1, 4).  In May 2004, the School District's CSE changed the student's placement to a special class for students with multiple disabilities that offered academic instruction, a life skills component, and related services at its middle school.  (Tr. 806, 811; SD-64 at 1, 4-5).  In December 2004, a reading evaluation of the student yielded the recommendation that the student be given remedial reading services to address his weaknesses.  (Tr. 560; SD-25).  The evaluators thought the Wilson Language System may not be beneficial for the student and recommended "a program administered in his special class program."  (Tr. 824; SD-25 at 2).

For the 2005-2006 school year, the student continued at the middle school as an eighth grader in a 8:1+1 special class for students with multiple disabilities and speech-language therapy, occupational therapy, and counseling.  (SD-1 at 5).  In the fall of 2005, the parents filed a State administrative complaint with the Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") alleging that they were, among other things, prevented from "addressing their son's needs as it concerns a reading program" at a September 2005 CSE meeting.  (SD-30 at 1, 5; P-A).  In a response dated May 1, 2006, VESID informed the district that the allegations were not sustained because the district had on other occasions considered the parents' request for a reading program and, without any new data to consider, it was not unreasonable not to discuss it further.  (SD-30; SRO Decision at 3, n. 2).

In response to the School District's reluctance to prescribe a reading program, the parents

obtained a private psychoeducational evaluation in December 2005.  The expert, Dr. Gloria

Tannenbaum, found that B.S.'s history and behavior is consistent with the diagnoses of

Pervasive Development Disorder, Not Otherwise Specified ("PDD-NOS"), Attention Deficit

Disorder—Predominantly Inattentive Type ("ADD"), as well as a reading disorder. (Plt. 56.1

¶ 13; Tr. 1298; IHO-1B; SD-2 "Dr. Tannenbaum's Report").  At the time, Dr. Tannenbaum

noted that "[t]here are no indications of emotional disorder."  (SD-2 at 7).  Dr. Tannenbaum

performed the WISC-IV intelligence test and the TONI-3 non-verbal intelligence test, and

concluded that:

> [B.S.'s] intellect and ability to achieve academically are extremely low
> compared to others his age.  Very possibly, WISC-IV results are a low
> estimate of his potential due to difficulties maintaining attention and to
> inconsistencies between subtests and Index scores.  Results of the TONI 3
> suggest higher potential.  He is comparatively stronger with thinking and
> reasoning that requires abstract thinking but not a lot of previously learned
> information. . . .  [B.S.] exhibits a reading disability greater than one
> would anticipate based on WISC IV results.  In terms of academics, he is
> well behind his peer group, but school reports indicate he is making slow
> progress in reading, spelling, and math skills and concepts.  In addition,
> based on school records and parental anecdotes, [B.S.] loves and benefits
> from science, social studies and art.  He seems to respond well to rules and
> strategies; thus a more formal approach to reading than has been provided
> in his current school would be to his advantage.

(SD-2 at 7).  Dr. Tannenbaum went on to recommend a specialized reading program for

the student, such as the Orton-Gillingham or Wilson programs for at least one hour daily

in school.  The report also contains some specific classroom strategies to promote the

student's reading and math skills as well as socialization opportunities (SD-2 at 11).

In a social history interview with the student's mother conducted on February 2,

2006, the mother reported that while the student has grown socially and emotionally since

coming to the middle school, he had made "little academic progress in reading, largely

due to a lack of consistent, structured research-based program. [However,] [h]e had made some progress in his math skills" (SD-3 at 2-3).  The mother did not believe that the student's program was meeting his needs and emphasized the need for "intensive reading support and a more intensive language program" and stated that she would like his program to be more individualized and targeted in reading, speech-language needs, and athletics. (SD-3 at 3).

On February 27, 2006, the CSE convened to review the student's progress and review the January 2006 Tannenbaum evaluation report.  (SD-1).  Ultimately, the CSE recommended that the student receive five 25-minute sessions of individual multisensory reading instruction (the Wilson program, specifically) per week for the remainder of the 2005-2006 school year.  (SD-1 at 1, 5).  The teacher who provided the instruction, Ms. Frasca, testified at the hearing that 25 minutes on a daily basis is not the standard way to administer the Wilson program and that an hour is standard.  (Tr. 2493-94; Plt. 56.1 ¶ 82).  Furthermore, Ms. Frasca admitted that the allotment of instruction recommended by the CSE "is not enough for anybody to benefit from Wilson's training."  (Tr. 2495:2-3). She had expressed this concern to Peter Beardsley, the former Director of the Special Education for KLSD, just before the February 2006 meeting which developed the IEP requiring the Wilson program be given to B.S.  (Tr. 2495-96; Plt. 56.1 ¶ 83).  Beardsley responded that since there was no one else available to teach 1:1 Wilson instruction, 25 minutes would have to be sufficient even though there would not be enough time to finish the program.  (Tr. 2497).  The parents argue that this is evidence of KLSD's lack of commitment to meeting B.S.'s academic needs (Plt. 56.1 ¶ 83).

9

There is conflicting evidence on B.S.'s progress by the end of his eighth grade year. The testimony of his teacher, Ms. Mellon, his report card, a teacher report of the student's strengths and weaknesses, and the student's progress in meeting goals set in his 2005-2006 IEP indicate progress, however the parents maintain that the student's WIAT-II scores indicate no progress and regression in some areas (Plt. 56.1 ¶ 75). According to Ms. Mellon's reports, the student made concrete progress in specific areas—both academically and socially. Ms. Mellon reported in his Report Card, dated March 21, 2006, that while he still exhibits weaknesses in reading, he is able to read a chapter a day with his teacher, he is able to read quickly and with some expression, and his comprehension and fluency is improving. (SD-9). He was also scoring 100% on spelling tests. *Id.* In the comment section of B.S.'s IEP for 2006-2007 school year, Ms. Mellon expressed that he made progress in writing and math skills, and demonstrates strong interest in social studies and science topics. (SD-17 at 4). Ms. Mellon notes that "[B.S] is becoming more and more independent. He is a role model for other students. He often helps his peers. . . . He is showing more responsibility for his daily homework." *Id.* at 2. In Ms. Mellon's teacher report dated April 17, 2006, she reports that the "student demonstrates appropriate basic academic skills in a highly structured and supportive learning environment." (SD-10).

Ms. Mellon's testimony about B.S.'s progress while in her class generally supports her reports. She explained that she observed B.S.'s improvement in reading as he moved from short, simple stories to more sophisticated chapter books. (Tr. 829). She observed that "[B.S.] was breezing through [the books] and the questions he was

answering were very easy for him to answer, he was able to go right back into the text and find the information. He was able to expand on his thoughts when making predictions." (Tr. 830-31). She concluded that he had made steady progress in all academic areas in 2004-2005 (Tr. 838; SD-1 at 5), and in 2005-2006 (Tr. 841; SD-17 at 4). She expressed that throughout the 2005-2006 school year, "[B.S.] was maturing, he continued to love school, he loved being part of our class, he loved being part of the school building, he was making more connections outside of the classroom of people that he knew and teachers that he knew. He was excited about what he was learning about." (Tr. 842). Ms. Mellon also agreed that she would have recommended that for ninth grade, the student continue in a class similar to what he had been in during middle school—a program that combines life skills and academic classes but at a higher level than what B.S. was doing in eighth grade. (Tr. 860-61).

On March 31, 2006, the School District's speech-language pathologist conducted a speech-language reevaluation of the student (SD-6). The evaluation included administration of the Clinical Evaluation of Language Fundamentals-Fourth Edition (CELF-4), which assesses receptive and expressive language skills; the Peabody Picture Vocabulary Test-Third Edition (PPVT-III), a measure of the student's receptive vocabulary skills; and the Expressive Vocabulary Test (EVT), a measure of his expressive vocabulary. (SD-6). His core language standard score on the CELF-4 was 56 (0.2 percentile) (*id.* at 1). The student's PPVT-III score was 72 (3rd percentile) and his EVT score was 78 (7th percentile) (*id.* at 1). The speech-language pathologist recommended that the student receive speech-language therapy for the 2006-2007 school

year (*id.*).

On April 7, 2006, Ms. Mellon administered the Weschler Individual Achievement Test-Second Edition (WIAT-II) (P-C; SD-17 at 4).  The student's subtest standard scores were: word reading 62 (1st percentile), reading comprehension 62 (1st percentile), numerical operations 65 (1st percentile), math reasoning 51 (<0.1 percentile), spelling 65 (1st percentile) (P-C; SD-17 at 4).  The parents cite these scores to show that B.S.'s academic ability declined while in Ms. Mellon's classes, since his previous WIAT-II scores from March 30, 2005 were: word reading 65 (1st percentile); math reasoning 50 (0.4 percentile) (SD-65).  However, on June 19, 2006, the school provided the parents with a report of his progress towards his annual goals and short-term objectives on his 2005-2006 IEP (SD-31).  Out of 60 short-term objectives, the student achieved designations of "PS" (progression satisfactorily-anticipated that the objective/benchmark will be achieved by the end of the school year or next CSE review) on 40 and "A" (achieved) on 18 (SD-16).

The speech-language evaluation of the student was repeated on April 30, 2006 by a private speech-language pathologist, Dr. Zinna (SD-11).  Administration of the CELF-4 yielded the following standard scores: receptive language 60 (0.4 percentile), expressive language 57 (0.2 percentile), core language score 56 (0.2 percentile) and language memory index 52 (0.1 percentile) (*id.* at 2).  Administration of the PPVT-III and EVT yielded standard scores of 79 (8th percentile) and 81 (10th percentile) respectively (*id.*).  Dr. Zinna concluded that the student demonstrated below average skills in both receptive and expressive language (*id.* at 6).  She also noted that weaknesses in sustained attention

12

and memory may have played a role in depressing his scores (*id.*).  She recommended

that the student receive speech-language therapy three times a week (*id.* at 7).

### b.  Development of the 2006-2007 IEP

On June 7, 2006, the CSE convened for the student's annual review for the 2006-2007

school year.  (SD-17).  Dr. Tannenbaum participated in the meeting by telephone (SD-17 at 6).

After discussing the student's progress in eighth grade and his strengths and weaknesses, the

special education teachers from the high school who were at the meeting described two options:

a 8:1+2 and a 15:1+1 special class offered at the high school.  (SD-18).  Dr. Tannenbaum opined

that the 15:1+1 special class that paralleled the high school curriculum would be "too

academically advanced" for the student, but that he would benefit from practical math and small

group or individual multisensory reading instruction (SD-17 at 6-7).  She also opined that a

program that provided "challenging" academic instruction with a vocational component was

appropriate for the student (*id.*).  At the hearing, Dr. Tannenbaum testified that while she could

not remember the exact wording of her conversation with the CSE, she reported that "[B.S.]

could be moving further ahead academically than he was because he had . . . higher conceptual

skills . . . than was showing on the tests and his attention deficit was impacting negatively on his

performance."  (Tr. 1310-11).  She also felt that "the regular high school academic program

[was] too advanced for him, and the program they were offering alternatively was too basic and

they needed something that was in between."  (Tr. 1317).

The CSE ultimately recommended that the student be placed in Ms. Frasca's 8:1+2

special class at the high school and receive five 40-minute sessions of individual reading

instruction, one 30-minutes session of individual counseling, two 40-minute sessions of group

13

occupational therapy, and one individual and two group 40-minute sessions of speech-language therapy per week.  (SD-17 at 1).  The CSE also recommended that the student participate in the regular physical education program and that he receive extended school year services for the summer of 2006 (*id.* at 1-3).  The parents expressed their disagreement with the recommendation by letter dated August 4, 2006.  The parents informed the district that they were amendable to alternative placement recommendations for the upcoming school year.  On August 7, 2006, the parents signed a contract for admission for the student to attend a private school, Maplebrook, which accepts students between the ages of 11 and 18 years who exhibit learning disabilities and ADD (SD-65; SD-72; P-V at 2-3).

The student attended Maplebrook as a day student for the 2006-2007 school year (Tr. 1061; SD-44 at 6).  On October 12, 2006, Maplebrook staff developed an IEP for the student that included annual goals and short-term objectives in math, English, reading, and American history (P-X).  He received English, math, and American history instruction in an 8:1 setting, reading instruction in a 6:1 setting, and a daily 40-minute individual reading tutorial (SD-44 at 6, P-Y at 7).  There was a social skills development aspect of the program, called the Responsibility Increases Self-Esteem (RISE) program (SD-44 at 6), and speech-language therapy (P-Y at 12-13).  Maplebrook offered classes to prepare students for Regents Competency Test (RCT) although B.S. was not yet able to take those classes (Tr. 276, 1754; SD-44 at 6).

### c.  Development of the 2007-2008 IEP

To begin the process of developing an IEP in the school district for the 2007-2008 school year, the CSE convened a meeting on May 11, 2007 at which point they discussed his progress at Maplebrook (SD-43; SD-44 at 6).  The dean of Maplebrook participated by telephone (*id.*).  No

14

IEP resulted from this meeting because the CSE wanted to wait to review educational testing results completed by Maplebrook that were not yet available (*id.*). However, the dean of Maplebrook reported to the CSE that the student had a "pretty good year" (*id.*).

On May 23, 2007, two private neuropyschologists conducted an evaluation of the student (SD-45, "Dr. Dorta's Report"). The student's WISC-IV scores were: verbal comprehension 81 (10th percentile, low average), perceptual reasoning 75 (borderline), working memory 68 (2nd percentile, borderline), and processing speed 59 (0.3 percentile, impaired) (SD-45 at 4). The full scale IQ score was 66 (1st percentile, impaired) (*id.* at 3). Another test administered, the Woodcock-Johnson Tests of Achievement-Third Edition (WJ-III ACH) yielded similarly low scores (*id.*). The evaluators concluded that the student's performance was overall far below age expectations in working memory, processing speed, perceptual reasoning, and abstraction skills (*id.* at 7). While his linguistic skills are an area of relative strength for B.S., they were also below average (*id.*). They did report that the student had made progress in reading and math reasoning, although overall his academic skills remained far below average (*id.*).

Most notably, Dr. Dorta recommended that "[B.S.] should continue in a vocationally driven training program for individuals with significant cognitive deficits and basic academic remediation to support functional skills should continue." (SD-45 at 7). Specifically, Dr. Dorta recommended a "highly structured pre-vocational program that will exploit his emotional and cognitive strengths and interpersonal relatedness" and that "[t]ies[s] academic instruction closely to the job demands" (*id.* at 7-8).

On June 29, 2007, the parents signed a contract and paid tuition to Maplebrook for the 2007-2008 school year (SD-68). The parents were unable to attend the next scheduled CSE

meeting on July 23, 2007.  On August 9, 2007, the CSE convened to discuss the student's 2007-2008 IEP (SD-44).  The CSE reviewed the student's progress reports from Maplebrook, Dr. Dorta's May 2007 report, and the class profile for the recommended 8:1+2 special class at the district's high school (SD-44; 45; 48; 49; Tr. 282-83).  Comments in the August 2007 IEP describe the father's concerns that the student have more opportunities for social skill development, interaction with peers, and participation in sports (SD-44 at 6).  The CSE discussed possible opportunities for B.S. to join clubs, athletic teams, and after-school activities as well as opportunities during the school day to attend general education classes in art, music, and physical education (*id.*).

The CSE recommended placement in a 8:1+2 special class with the same provision of counseling, occupational therapy, and speech-language therapy as in the 2006-2007 IEP.  The CSE did not recommend a reading program (SD-44 at 1).  The comments do not indicate why the CSE did not feel a reading program was necessary or what had changed from the previous IEP.  The annual goals and short-term objectives were identical to those proposed in the 2006-2007 IEP (*compare* SD-44 at 7-25 *with* SD-17 at 7-25), even though B.S. had just completed a full year at Maplebrook and accomplished many objectives in his classes (Plt. 56.1 ¶¶ 135-38).  Even though educational testing done at Maplebrook was not available at the CSE meeting that resulted in the 2007-2008 IEP, progress reports from Maplebrook were available (SD-44 at 6; P-Y; Z).

The parents informed the school district on September 13, 2007 that they rejected the August 2007 IEP and planned to keep B.S. at Maplebrook for the 2007-2008 school year.  They provided specific reasons for their rejection and requested that the district reimburse them for the

the cost of his tuition (SD-53).  On September 24, 2007, the parents sent another letter to the

school district requesting permission to observe the district's proposed classroom (SD-55),

however the district's director of special services essentially denied the request (SD-56).  She

expressed concern that the student was already attending Maplebrook and questioned the purpose

of the observation unless the parents were seriously considering moving their son back into a

district classroom (*id.*).

### d.  Impartial Hearing and Administrative Review

On December 7, 2007, the parents filed a due process complaint notice alleging that the

district failed to offer the student a FAPE and requested, among other things, tuition

reimbursement for Maplebrook for the 2006-2007 and 2007-2008 school years (IHO-1 at 4, 8).

Specifically, the parents assert that the district failed to consider other programs and placements,

such as a BOCES program, that would have suited the student's needs better than the self-

contained program recommended by the district (*id.* at 6).  The parents argue that in developing

the IEPs, the district failed to account fully for the student's strength and the private evaluation

results that recommended programs other than the ones provided by the district (*id.* at 7).  The

parents disagreed that the student should have been placed in a basic life skill program with

"more severely autistic or otherwise impaired [students] . . . who ha[d] physical disabilities

and/or behavioral problems" that would have been distracting and inappropriate for B.S. (*id.*).

After a lengthy hearing, the IHO determined that the district offered the student an

educational program in the least restrictive environment (LRE) "that was reasonably calculated

to provide progress" (IHO Decision at 40-41).  The IHO's decision was based on the fact that the

parents' experts did not support the claim that the district's program was legally insufficient (*id.*).

17

The IHO found that the student was making progress in the 2005-2006 school year and had no reason to conclude that the student's progress would suddenly stop if he continued his studies in the life skills program recommended by the district (SRO Decision at 13, citing IHO Decision at 43). Thus, the IHO denied the parent's request for tuition reimbursement.

The parents appealed the IHO's decision and contended that there were procedural and substantive defects in the IEPs (SRO Decision at 13). Procedurally, the parents asserted, among other things, that the annual goals and short-term objectives were predetermined and not individualized for their son (*id.*). Substantively, the parents argued that the IEPs were not designed to confer any education benefit on the student to allow him to progress: (1) the reading program was not appropriately implemented and was missing entirely from the 2007-2008 IEP; (2) the parents were not provided with a proposed curriculum for the programs; (3) the IEPs did not contain a curriculum or methodology as to how the program would be administered; (4) the class profiles indicated that the student would be placed with students whose needs were vastly different from his own; (5) the proposed programs and goals lacked a significant academic component; (6) the goals were too generic and basic for the student to make any meaningful progress; (7) the CSE ignored information from the parents and their experts; (8) the CSE repeatedly denied the parents' request to consider alternative programs; (9) the student was miscategorized based solely on his IQ, rather than a more holistic evaluation of his strengths and weaknesses. (SRO Decision at 14).

The parents asserted at their appeal, and continue to assert in this Court, that the IHO and SRO were biased against the parents, and unfairly denied them a truly impartial hearing and review (*id.*; Plt. 56.1 ¶ 217-221; 253-259). The SRO addressed the parents' claim that the IHO

18

demonstrated bias and found it to be unpersuasive based on a review of the transcript and the interactions the parties had with the IHO. (SRO Decision at 17). The SRO also found that because the parents did not raise procedural violations in their due process complaint, IHO properly did not address or render a decision on those issues. (SRO Decision at 18).

In addressing the parents' substantive objections, the SRO found that the June 2006 IEP thoroughly considered the student's emotional, social, academic, and psychological development, drew upon evaluative testing done by the district and the parents' own experts, and took into account the parents' opinions. (SRO Decision at 20). The SRO found the June 2006 IEP contained measurable, specific, and comprehensive annual goals and short-term objectives with requisite evaluation criteria, procedures, and schedules (*id.*). In part, the appropriateness of the June 2006 IEP was based on the student's success in that program in prior school years, and cited caselaw that supports the position that when an IEP is modeled on a prior, successful IEP, there is a strong likelihood that the IEP in question would continue the same trend (SRO Decision at 21, citing *M.C. v. Rye Neck Union Free Sch. Dist.*, 2008 WL 4449338, 16 (S.D.N.Y. Sept. 29, 2008)). Accordingly, the SRO agreed with the IHO that "there was no reason to conclude that the student's progress would suddenly stop had he continued his studies in the program recommended by the districts' CSE, particularly in light of the progress the student previously achieved in the district's program." (SRO Decision at 21).

The SRO also rejected the parents' claims that the district failed to present the parents with a proposed curriculum and/or methodology for the student or include it in the IEPs. (SRO Decision at 22). According to the SRO, there is no legal requirement to make curricula or methodology components of a student's IEP, in part because the precise teaching methodology to

be used by a student's teacher is generally a matter to be left to the teacher. (*id.* citing *Rowley*, 458 U.S. at 204 (the student has no entitlement to the "best" program possible); *MM v. Sch. Bd. of Miami-Dade County*, 437 F.3d 1085, 1102 (11th Cir. 2006)). Furthermore, the SRO found that Ms. Frasca's testimony demonstrated the appropriateness of her program for a student like B.S. (*id.*). The SRO disagreed that the class profile for the recommended placement showed that B.S. would have been grouped with students whose needs vastly differed from his own (*id.* at 23).

Similarly, the SRO found that the 2007-2008 IEP was developed taking into consideration the parents' views (expressed at two CSE meetings—one in May and one in August 2007), the evaluative reports of the parents' experts, and lengthy discussions about the student's needs (*id.* at 24). Specifically, the CSE relied on the private neuropsychological evaluation performed by Dr. Dorta that recommended a "vocationally driven training program for individuals with significant cognitive deficits and basic academic remediation to support functional skills." (SRO Decision at 24, citing SD-45 at 7). Thus, the program recommended by the CSE, which combined remedial academics with life skills instruction, fit the parents' expert's own findings (*id.* at 25). The class profiles for the 2007-2008 class were also still appropriate given that there had been no change in B.S.'s cognitive, language, or social skills that would have made the class grouping inappropriate (*id.*). The SRO concluded that the August 2007 IEP offered the student a FAPE for the 2007-2008 school year (*id.*). Because he found that the IEPs in question were appropriate, the SRO did not reach the issue of whether Maplebrook was appropriate for either school year and denied the parents' request for tuition reimbursement (*id.*).

### e.  B.S.'s Hospitalization

The parents kept their son at Maplebrook for three years, but when they could no longer afford the school they worked with KLSD to develop an IEP for the 2009-2010 school year. (E.S. Aff. ¶¶ 5-8).  The father proffered that B.S. was flourishing at Maplebrook, in part because he was able to take part in the school's athletic program.  (E.S. Aff. ¶ 10).  The parents observed that he was functioning well at Maplebrook, but his mental state began to deteriorate when they informed him that he would be returning to KLSD the next fall.  (E.S. Aff. ¶¶ 18).

The parents explained that he began to feel tremendous anxiety over attending the public high school, in part because he would not be able to participate in sports and in part because he had been taunted by non-disabled students at the school.  (E.S. Aff. ¶¶ 19-22; 32-36).  When he attended a summer program at the public high school in anticipation of the new school year, he became even more anxious, depressed, and agitated at home.  (E.S. Aff. ¶¶ 44-45, 47, 49-51).  About one week before B.S. was scheduled to begin the fall semester, he was admitted to Four Winds Hospital due to a resurgence of psychiatric symptoms.  (E.S. Aff. ¶¶ 53-54; "Mallenbaum Letter," Plt. Memo of law, Supplemental Evidence Ex. B).

The parents allege that the district was on notice of B.S.'s psychological instability, and that the IEPs did not take this into account (Plt. 56.1 ¶ 222-33).  While they concede that no one could have predicted with any certainty that B.S. would have a psychotic event if he had been forced to attend the classes recommended by the CSE in 2006 or 2007, the parents argue that the district did not take measures to prevent such an outcome by placing B.S. in an alternative program that was appropriate to his needs.  (Plt. 56.1 ¶ 233).  Defendants disagree and assert that there was no indication that B.S. was psychologically fragile or that the IEPs should have taken

into account the risk of a psychotic event of this nature. (Deft. 56.1 ¶¶ 15-20).

The Court allowed evidence of the student's hospitalization, the original IEP for the

2009-2010 school year, and the emergency residential placement that the CSE recommended

subsequent to the hospitalization because it provided relevant information to the Court about the

status of the student. However, the Court has always maintained that this information cannot be

admitted as evidence that the IEPs in question were inappropriate. Even if Plaintiff can show

that B.S.'s psychological fragility was brought to the attention of the CSE or was an issue before

the IHO or SRO, there is no way for the Court to say that a major psychotic episode that

occurred in August 2009 is probative of IEPs for the 2006-2007 and 2007-2008 school years.

Therefore, the Court takes this information into account but finds that it does not affect its

analysis of either the 2006-2006 or 2007-2008 IEPs because the Court cannot draw a connection

between the event and these IEPs and the Court cannot speculate as to what might have

happened if B.S. had returned to KLSD for these school years.

### III.   Discussion

In their Complaint, the plaintiffs assert that the SRO Decision should be reversed for the

following reasons:

1. The SRO and IHO erred and acted contrary to 8 NYCRR 200.6(h)(2) in concluding
   that B.S. was appropriately grouped with students whose needs were similar to his for
   the two relevant school years. Complaint ¶¶ 29-53 and 92.

2. The SRO and IHO erred in finding that B.S. had made meaningful progress during his
   2004-05 and 2005-06 school years while enrolled in the defendant District's school.
   Complaint ¶¶ 28, 63 and 65.

22

3.  The SRO and IHO erred in finding that the program proposed by the defendant District for B.S. was appropriate because (a) B.S. needed a program which would provide more extensive social skills training and adaptive behavior training, (b) the defendant District's program did not provide adequate vocational training such as would be offered in a BOCES program which the plaintiffs requested that the District consider, (c) the defendant District's program was too basic and not sufficiently academically challenging and (d) the defendant District's program for 2007-2008 did not contain an individual reading program. Complaint ¶¶ 54-61, 66-67, 78 and 92.

4.  The IHO was biased, and the SRO was biased.  Complaint ¶¶ 79-80, 106-109.

5.  The Complaint also asserts that for the two school years at issue, the defendant District should have considered a BOCES program or a program offered by other school districts for B.S.  Complaint ¶¶ 20, 56 and 82.

### a.  Summary Judgment under IDEA

In an IDEA case, summary judgment "triggers more than in inquiry into possible disputed issues of fact.  Rather, the motion services as a pragmatic procedural mechanism for reviewing" an administrative determination. *Lillbask ex re. Mauclaire v. Conn. Dept. of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citation omitted).  While the district court must base its decision on the preponderance of evidence, it "must give due weight" to the administrative proceedings, "mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve difficult questions of educational policy." *Gagliardo*, 489 F.3d at 113.  Accordingly, "district courts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *A.C. & M.C. ex rel. M.C. v. Bd. of*

23

*Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (quoting *Rowley*, 458, U.S. at 206).

### b.  IHO and SRO Bias

Because Plaintiffs argue that the Court should afford less deference to the IHO and SRO due to their biases, the Court addresses this issue first.  After reading the entire hearing transcript, the Court does not agree that the IHO was biased against Plaintiffs. The interactions between the IHO and the parties, while tense at times, were fair and impartial.  The IHO advised the parties of his experience representing school districts, but Plaintiffs' counsel ultimately withdrew his motion to recuse the IHO (Tr. 3, 7, 9-10).  The IHO asked questions of both parties' witnesses.  He also sustained and overruled objections raised by both sides.  He used his authority to speed along a lengthy proceeding by limiting irrelevant or duplicative testimony.  The IHO granted extensions and accommodated the parties' schedules as best he could.  His actions do not show a bias or lack of impartiality, and therefore the Court upholds the SRO's finding on this issue.

Similarly, the Court analyzed the SRO decision in light of the administrative record and found that it was a fair and objective review of the evidence.  The SRO paid careful attention to the student's evaluations, the parents' comments, the recommendations of the parents' experts, and how the IEPs were developed.  It is a thorough opinion that displays no bias against the parents.  The evidence that the parents attempted to introduce, namely documents questioning SRO Kelly's impartiality in other cases, was not considered by the Court because it was not properly part of the record. (Plt. Memo of Law, Ex. G).  Furthermore, the Court's only concern is the SRO's conduct in *this* case, not the allegations of other families in the State.  The Court concludes that

neither the IHO nor the SRO displayed any form of bias against the parents. Therefore, the Court affords their decisions the appropriate level of deference in its review.

### c.  The 2006-2007 IEP

> #### 1.  The class grouping for 2006-2007 IEP was appropriate under 8 N.Y.C.R.R. § 200.6(a)(3); 8 N.Y.C.R.R. § 200.6(h)(2), 8 N.Y.C.R.R. § 200.1(jj)

Plaintiffs object that the class grouping for the 2006-2007 IEP was inappropriate because it grouped B.S. with students with dissimilar disabilities and greater needs than he has. (Plt. 56.1 ¶ 207). Specifically, B.S.'s mother felt it was "unacceptable that B. would be expected to be in . . . a classroom with so little stimulation, so little social capacities and IQs and language together with kids who are far more impaired." (Tr. 999). She compared and contrasted the students in the class profile with B.S.'s profile and concluded that most of the children in the class had lower IQs, lower language scores, required 1:1 teaching assistants, adaptive physical therapy, physical therapy, and one required behavioral consultations. (Tr. 1125-1127). While there was one student who presented as having a higher intellectual function than B.S., the mother felt that the other data, namely the CELF-4, showed that this student had profoundly impaired language abilities. (Tr. 1127-28).

As cited above, the New York regulations implementing IDEA require that children be grouped together in a special education class only if they have "the same disabilities" or if they have "differing disabilities [but] ... similar individual needs for the purpose of being provided a special education program." 8 N.Y.C.R.R. § 200.1(jj);*see also* 8 N.Y.C.R.R. § 200.6(g)(3). A CSE must also strive to "assure that the social interaction within the group is beneficial to each student, contributes to each student's

25

social growth and maturity, and does not consistently interfere with the instruction being provided." 8 N.Y.C.R.R. § 200.6(a)(3)(ii). Nevertheless, the regulation cautions that the "social needs of a student shall not be the sole determinant" of his or her class placement. *See id; Walczak*, 142 F.3d at 123.

Defendants argue that B.S.'s evaluations, performed by both the district and the parents' own experts, indicate that B.S. has extremely low cognitive function and performs far below average academically. They cite to his own WISC-IV full scale IQ, CELF-4 scores, and WIAT-II scores to show that not only is B.S. not the highest functioning student in the class but in fact his scores are consistent with the rest of the class: at or below the 1st percentile in most areas. (SD-11). It is true that some of the students in the class require adaptive physical therapy, 1:1 teaching assistants, and in one case, behavioral consultations. However, the district argues that it is unreasonable to expect that students with multiple disabilities will be identical. Furthermore, B.S.'s classification places him on the autism spectrum—like the other students in the class. Defendants also point to B.S.'s progress in the seventh and eighth grade versions of the same class as evidence that he is appropriately grouped with students with these characteristics.

The main evidence the Plaintiffs highlight, other than the mother's own testimony, is the evaluation performed by Dr. Tannenbaum that suggested B.S.'s scores are very possibly a low estimate of his abilities, however the results indicate that B.S.'s "intellect and ability to achieve academically are extremely low compared with others his age. (SD-2 at 7). Dr. Tannenbaum did not recommend the more sophisticated 15:1+1 class for the 2006-2007 school year, although she did feel that the 8:1+2 program was too

basic and recommended the district look at alternative placements. (Tr. 1317).

The Court does not disagree that B.S. likely has a higher potential than his test scores indicate. But, the Court does disagree that the school district treated B.S. as just a set of test scores. The input of Ms. Mellon provided a qualitative assessment of B.S.'s achievements, and the CES gave the parents a full opportunity to present their perspective as well. However, the evaluations are another important piece of the puzzle. While each student in the class profile has unique attributes, the majority of measurable indicators show that the students have similar needs for the purpose of providing special education. They all need remedial reading instruction, intensive speech-language instruction, and training in social skills.

The Court is not being asked whether this was the best possible group of children with whom B.S. could have been placed. To the extent the Court agrees with the parents that this class profile may not have provided a beneficial social interaction to B.S., the social needs of B.S. cannot be the sole factor in determining his placement. In this case, the similarities in academic and cognitive needs amongst the group make it an appropriate placement. The "mere fact that a separately hired expert has recommended different programming does nothing to change [the] . . . deference" to the district and its trained educators. *Watson v. Kingston City Sch. Dist.*, 325 F.Supp.2d 141, 145 (N.D.N.Y. 2004), *aff'd* 142 Fed. Appx. 9, 10 (2d Cir. 2005). Therefore, the Court concludes that for the 2006-2007 IEP, the IHO and SRO did not err in finding that the class grouping was appropriate and legally sufficient under IDEA and New York regulations.

### 2.   The IHO and SRO properly found that B.S. made progress in 2004-2005 and 2005-2006 school years

Plaintiffs assert that the IHO and SRO improperly relied on the subjective perspective of Ms. Mellon in finding that B.S. made progress in middle school.  In doing so, they ignored the WIAT-II test results that the parents allege show regression or no progress.  The Court rejects Plaintiffs argument and finds it perplexing that Plaintiffs, who premise their suit on the inadequacy of evaluative tests in reflecting B.S.'s true academic ability, would then prefer to rely on test results over the detailed observations of B.S.'s teacher of two years.

Ms. Mellon's 4/21/05 Teacher Report  described B.S. as a child who had made gains in word reading and fluency, spelling, reading comprehension, writing, numerical operations, organizational skills, daily living skills and a number of other areas. (Deft. 56.1 ¶ 34; SD-23).  She provided detail with respect to B.S.'s progress reflected in her Teacher Report, further evincing meaningful gains in his reading, writing, spelling and overall comfort and independence in his educational environment. (Deft. 56.1 ¶ 35; Tr. 829-836).  At the IHO hearing, she testified that B.S. had a very successful, and, in fact, "great" 2004-2005 school year in her program and the mother testified that she  agreed with that conclusion. (Deft. 56.1 ¶ 36; Tr. 828 and 1597).

According to Ms. Mellon's testimony,  B.S. had another "great" school year in Ms. Mellon's "life skills" class for the 2005-2006 school year. (Deft. 56.1 ¶ 37; Tr. 828, 836-837 and 857).  During the 2005-2006 school year, B.S. was described as having "made steady progress in all academic areas." (Deft. 56.1 ¶ 39; SD-1).  For the 2005-2006 school year, B.S. was described by Ms. Mellon as happy, communicative, independent and learning, as making remarkable progress in all academic and social-

28

emotional areas, as becoming increasingly comfortable, independent, maturing and as making meaningful, even remarkable, academic gains in all areas; as actually volunteering to read in front of the class. (Deft. 56.1 ¶ 40; Tr. 839-853).

B.S.'s March 21, 2006 Report Card reflected gains in all academic areas, as well as with respect to his life skills, reported that B.S. received grades of 100% on most spelling tests and commented that B.S. was becoming "more and more independent," was showing responsibility for his daily homework, was becoming a role model for other students, often helped his peers and enjoyed playing with them at recess. (Deft. 56.1 ¶ 41; SD-9; SRO decision at 5). Ms. Mellon's April 17, 2006 Teacher Report for B.S. reflected improvements in B.S.'s decoding skills, reading comprehension, mathematics, word problems, counting money, writing, working independently, socialization and other areas; that he had improved his ability to work independently and independently follow a daily routine and classroom schedule, and that B.S. enjoyed interacting with classmates during the day and at recess. (Deft. 56.1 ¶ 42; SD-10; SRO Decision at 6-7). By the end of the 2005-2006 school year, B.S. had achieved or made satisfactory progress with respect to all IEP goals and objectives. (Deft. 56.1 ¶ 44; SD-31).

During the administrative hearings before the IHO, the plaintiff parents testified that because B.S. felt safe and secure in the defendant District, that this presented a "window of opportunity" for the defendant District to maximize B.S.'s education beyond what it was proposing (i.e., "to really cash in"). (Deft. 56.1 ¶ 45; Tr. 937-939, 945, 2184-2185, 2187-2188; 2190-2192). The parents attempt to distinguish this comment by saying that B.S. may have made social and emotional progress, but they felt the WIAT-II scores showed that he did not progress academically. It is undisputed that the WIAT-II

29

scores from April 7, 2006 do not show an increase from March 30, 2005 test (P-C; SD-69), however the Court does not see a "regression" as B.S. remained in the same percentile or dropped only slightly. (Plt. 56.1 ¶ 179). The Court finds that taking all of the evidence of B.S.'s performance into consideration, the IHO and SRO did not err in finding that he made progress in middle school.

### 3.  The 2006-2007 IEP provided B.S. a FAPE

A "free appropriate public education" must include "special education and related services" tailored to meet the unique needs of a particular child, 20 U.S.C. § 1401(a)(18), and be "reasonably calculated to enable the child to receive educational benefits," *Rowley*, 458 U.S. at 207; *Walczak*, 142 F.3d at 122.  The Court is aware that IDEA does not require school districts to provide services "sufficient to maximize each child's potential commensurate with the opportunity provided other children," *Rowley*, 458 U.S. at 200-01, however the educational benefit provided must be "meaningful," *see, e.g.*, *Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009) (the IEP must be "likely to produce progress, not regression, and [must] afford[] the student with an opportunity greater than mere trivial advancement."); *Deal v. Hamilton Co. Bd. of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004).

Given what the CSE knew about B.S. at the time it was developing the 2006-2007 IEP, the recommended class was reasonably calculated to enable the child to receive educational benefits.  The CSE considered: the Extended School Year eligibility form (4/17/06), Ms. Mellon's Teacher Report (4/17/06), Speech-Language Evaluation (3/31/06), Report Card from 2005-2006 school year (3/21/06), Extended School Year eligibility form (3/8/06), Occupational Therapy Evaluation (2/17/06), Private

30

Psychoeducational Evaluation (Dr. Tannenbaum's Report—1/19/06), Social History

Update (1/2/06), Assistive Technology Evaluation (6/15/05), Occupational Therapy

Progress Summary (3/01/05), Reading Diagnostic (12/22/04), and a classroom

observation (10/2/02), and physical examination (5/22/02).  (SD-17 at 7).

      The Comments, derived mostly from Ms. Mellon's observations, depict a student

who is doing well on the course that he is on and is benefiting from the program chosen

by the school district.  Dr. Tannenbaum was able to participate by telephone and

described a student who would benefit from practical math and small group or individual

multisensory reading instruction.  She believed a program with challenging academic

study and a vocational component would be appropriate for B.S.  Everyone at the

meeting agreed that the 15:1+1 class that parallels the high school curriculum would be

too academically advanced for B.S.  (SD-17 at 6-7).

      At this point, the parents and the school district disagreed: the parents wanted the

school district to look for alternative placements, such as the BOCES program, while the

CES believed the 8:1+2 special class was appropriate.  While few details about Ms.

Frasca's methods were reported in the IEP, it was accepted to be the high school

continuation of Ms. Mellon's class.  At the hearing Ms. Frasca described a class that is

highly individualized and could be adapted to fit the needs of the specific student in a

number of subjects (Tr. 2436-2441).  She described how she worked with the students

individually at their own level in math, language arts, and reading.  (Tr. 2437-38).  Other

subjects were conducted as a group and tracked the curriculum of the general education

classes, such as global history.  (Tr. 2440).

On cross-examination, Ms. Frasca testified that when she met with the plaintiff mother before the June 2006 CSE, she explained that the class was becoming more focused on academic achievement and could help children like B.S. attain IEP diplomas or transition into modified programs in hopes that they could pass their RCTs. (Tr. 2499; P-GG). Her comments reinforce the district's view that the recommended class would provide B.S. with an individualized program designed to help him progress in a meaningful way.

The Court also finds that Ms. Frasca's class was reasonably calculated to implement the recommendations of Dr. Tannenbaum. For example, Dr. Tannenbaum recommended an hour a day of one-on-one, multisensory reading instruction such as the Wilson Program. The 2006-2007 IEP prescribes 40 minutes a day of one-on-on reading instruction, to be provided by Ms. Frasca who was B.S.'s Wilson program tutor the year before. (SD-17 at 1; SD-2 at 8). Other study strategies included making less distracting worksheet for him, obtaining high interest/low level trade books for B.S., introducing text books and books on tape, and continuing to use math manipulatives to understand math concepts of multiplication, division, money, and time. (SD-8). These strategies would be easy to implement in a small class setting with the flexibility to individualize the curriculum to meet the student's needs, such as in Ms. Frasca's class.

The Court can understand the parents' frustration that the CSE recommended a program that they did not accept, however the district is required to provide an "education that is 'appropriate,' not one that provides everything that might be thought desirable by 'loving parents.'" *Walczak*, 142 F.3d at 132. In this case, the Plaintiffs have

32

not shown by a preponderance of evidence that the 2006-2007 IEP was inappropriate given all the qualitative and quantitative information known about B.S. at the time.

### d.  The 2007-2008 IEP

#### 1.  The class grouping for 2007-2008 IEP was inappropriate under 8 N.Y.C.R.R. § 200.6(a)(3); 8 N.Y.C.R.R. § 200.6(h)(2), 8 N.Y.C.R.R. § 200.1(jj)

The district argues that nothing changed during the 2006-2007 school year to render the class grouping for the 2007-2008 special class inappropriate.  B.S.'s evaluations—Dr. Dorta's WISC-IV and WJ-III evaluation on May 23, 2007 and administration of the WIAT-II on August 22, 2007 (SD-45; SD-51)—yielded low scores and reinforced B.S.'s classification as mildly mentally retarded in addition to his PDD-NOS classification.  Dr. Dorta concluded that the results of his evaluation "appear to be valid estimates of his learning and neurocognitive functioning." (SD-45 at 6).  Dr. Dorta found that the "evaluation reveals a complicated profile of neurocognitive impairments" and that "[B.S.]'s overall linguistic ability is in the below average range and his visuo-perceptual reasoning skills are in the borderline range [].  His overall intellectual skills are in the impaired range." (SD-45 at 6-7).

The WIAT-II test, administered by the district on August 22, 2007, showed little change from his results in 2006.  (SD-51 at 3).  The results demonstrated, once again, that B.S.'s academic achievement levels are extremely low in word reading, reading comprehension, and math reasoning (*id.*).  The evaluators recommended that B.S. continue to receive intensive, direct instruction to improve his word reading, reading comprehension, math reasoning, numerical operations, spelling, and written expression.

They also recommended skill development to enable B.S. to perform successfully in life skills and pre-vocational training skills. (SD-51 at 4).

However, while the district fully considered B.S.'s experiences in Ms. Mellon's class when proposing the 2006-2007 IEP, it did not adequately consider what progress B.S. made at Maplebrook during the 2006-2007 school year. First, the Court considers the classroom settings. B.S. received English, math, and American History instruction in an 8:1 setting, reading instruction in a 6:1 setting, a daily 40-minute individual reading tutorial. (SD-44 at 6, P-Y at 7). His progress reports, as discussed more thoroughly below, indicate that B.S. was able to progress in these settings.

While the Court does not have specific information on the class profiles at Maplebrook, the literature provided by the parents inform the Court that Maplebrook generally admits students with IQ scores of 70 and above and does not admit students with primary emotional or behavioral diagnoses. (P-V at 1). The Court credits testimony by Dr. Rosen and B.S.'s mother that B.S. is excelling at sports at Maplebrook, is performing well in the RISE system, and is able to interact with students who are his peers at Maplebrook. (Plt. 56.1 ¶¶ 153, 155, 156; Tr. 1511-1513, 1950-55). B.S.'s father also noted that B.S. benefited tremendously from being with his peers. (E.S. Aff. ¶¶ 10-13).

Maplebrook also conducted testing that demonstrated B.S.'s social and emotional progress. In December 2006, the school administered the Adaptive Behavior Assessment System-Second Edition (ABAS-II), a nationally normed research based instrument that measures skills which are important in everyday life. (Plt. 56.1 ¶¶144-45; P-J; Tr. 1878-79). The test was administered again in January 2008 (P-K). Dr. Rosen testified at the

34

hearing that there was a dramatic difference in communication abilities and other social

skills. (Tr. 1942-43). Another expert who has evaluated B.S. stated at the hearing that

skills measured by the ABAS-II test correlate to "adaptive skills and socialization skills,

which [Dr. Dorta] define[s] as most critical because they are the most predictive for long

term outcome in children with [B.S.'s] condition." (Tr. 1264). Dr. Dorta agreed that

B.S. has made "significant" progress in these skills while at Maplebrook. (Tr. 1262-63).

On the other hand, the class profile for the class the CES recommended changed

from 2006-2007 to 2007-2008. Instead of five other students, there were only three—and

they still required management services such as adaptive physical education, behavioral

consultation, and 1:1 teaching assistants. (SD-49). While the differences between the

students in Ms. Frasca's class and B.S. were not as apparent to the CSE the year before,

the differences were far more obvious as the CSE developed the 2007-2008 IEP. The

district failed to take into account how B.S.'s development while at Maplebrook changed

his own profile, even while test scores remained low. The Court concludes that the class

grouping for the 2007-2008 IEP violated New York regulations implementing IDEA by

placing children in a class with significantly different needs.

### 2. The IHO and SRO did not credit any of the progress B.S. made in the 2006-2007 school year in forming the IEP for 2007-2008

Even though the district carefully considered the observations of Ms. Mellon, it

failed to credit the progress B.S. made while at Maplebrook during the 2006-2007 school

year. The Court believes this qualitative data should have been a critical part of

developing B.S.'s IEP.[3]  Across the board, B.S.'s teachers noted his progress in core

academic areas.  For example, his November 2006 Progress Reports indicate that B.S.

made progress:


- In reading, Mr. Larocca reported: "[B.S.] works hard and stays focused in

  class.  His homework is completed inconsistently, but there has been

  considerable improvement with that lately.  [B.S.] has gaps in decoding

  skill and we are working on that.  He struggles in many areas of reading

  comprehension but does extremely well learning new vocabulary." In all

  areas, B.S. received a "MP" (made progress) and in one goal he received a

  "MS" (mastered as stated). (SD-48).

- In writing, Mr. O'Connor reported: "[B.S.] has shown great interest in

  some of the topics discussed and written about this semester.  The study of

  current events resulted in some excellent writing assignments from [B.S.].

  [He] still needs to spend more time in the careful revision of his work. . . .

  Overall, I am pleased with the improved effort [B.S.] has shown."  B.S.

  made progress on objectives such as "constructing clear and accurate

  sentences" and learning to "accurately describe a problem."  (SD-48).

- In math transactions, Mr. Hudson reported: "[B.S.] continues to expand

  his skills in the following areas: pay wages and taxes, living expenses and

  budgeting, consumer purchases, grocery shopping, restaurant service

  gratuities, percentages, addition, subtraction, multiplication, division,

---

[3] Another form of testing, the Terra Nova test, is used at Maplebrook.  (Plt. 56.1 ¶ 149).  However, there was a dispute during the IHO hearing over the accuracy of conducting off-grade testing.  (Tr. 2348-2355). The Court did not find it necessary to address this issue in order to decide the case.

career math, check writing, balancing checking account . . . . [but] Math continues to be challenging for [B.S.] . . . . I continue to be pleased with [his] positive attitude, work ethic, and progress."

-   In American history, Ms. Coviello reported: "[B.S.] is learning a wealth of information and continues to make progress in all the above objectives. He is determined to try challenging assignments. . . . [B.S.] volunteers to read from the book and does a great job. He is very capable and I look forward to continuing growth."

His April 2007 Progress Reports show the most progress in reading, where Mr. Larocca reported "[B.S.] has made good strides this year developing his reading comprehension skills. He works hard and has improved his ability to stay focused. [His] greatest improvement may be in doing his homework. It is consistently completed to an excellent level." (P-Y). Other notable progress was notes in the following areas:

-   American history: "[B.S.] tries very hard in this course . . . and never gives up no matter how challenging the work may seem. . . . He often surprises me with the amount of information he has retained from each lesson."

-   Language therapy: "He has achieved accuracy of 80% on tasks requested of him" such as the ability to initiate conversations with relevant and appropriate questions and improvement in auditory processing of oral language.

-   English: "[B.S.] should be proud of the effort he put into his Tiki Barber PowerPoint presentation."

The only area that B.S. struggled in was math transactions, however his teacher believed

"[B.S.] can become highly proficient in math" if he completes his homework and practices more. (P-Y).

The district's failure to take into account the progress B.S. made at Maplebrook is evident in the proposed IEP in two ways: (1) the 2007-2008 omits an individualized reading program, even though Dr. Tannenbaum explicitly recommended it the year before and B.S.'s reading improved at Maplebrook with the use of multisensory instruction; (2) the annual goals and short-term objectives are identical to those proposed in the 2006-2007 IEP, which reveals that the district never actually evaluated B.S.'s academic needs after the 2006-2007 school year and integrated that information into a new IEP. The SRO explained in a footnote that the reading program had been omitted because Dr. Dorta's report from 2007 did not recommend a 1:1 program and at Maplebrook the student only received 1:1 instruction four times a week.[4] (SRO Decision at 24, n. 21).

The SRO's explanation is not convincing to the Court as there is no evidence in the record to support his conclusion. The Maplebrook progress reports demonstrate that the Wilson method and 1:1 reading had been effective for B.S. Dr. Dorta's report may not have specifically recommended 1:1 multisensory reading instruction, but neither did he recommend that it be discontinued. The Court concludes that the reading instruction was omitted from the IEP because the CSE did not seriously consider the progress B.S. made using multisensory reading instruction at Maplebrook.

The Court is even more troubled by the repetition of the annual goals and short-term objectives from the 2006-2007 IEP and 2007-2008 IEP. The Maplebrook progress

---

[4] The SRO mistakenly states that at Maplebrook gave B.S. 1:1 reading three times a week, however, the Maplebrook IEP reflects that it was actually four times a week. (SD-44 at 6).

38

reports go into some details on the objectives that B.S. worked on over the 2006-2007 school year and how he performed. The Maplebrook objectives do not line up perfectly with those in the district's IEPs, however the CSE should have tailored the 2007-2008 objectives to take into account objectives B.S. has already met, ones that are now too basic for him, or objectives that continue to be challenges.

In order to create an educational program that is reasonably calculated to enable B.S. to progress meaningfully, the CSE must create goals and objectives that align with B.S.'s needs. On this record, it is not credible that after a full year of education, B.S.'s needs were identical to those the CSE found the year before. To implement an IEP in light of evidence that B.S. progressed at Maplebrook would be inherently regressive. It is apparent that the CSE simply reprinted the unedited IEP. The Court finds that recycling an old IEP is not legally sufficient because it is not individualized or appropriate for B.S. for the specific school year to which it pertains.

### 3.  The 2007-2008 IEP did not provide B.S. a FAPE

The Court has found that the class grouping under the 2007-2008 IEP was not appropriate. The Court also found that the district did not take into account the progress B.S. made at Maplebrook in formulating the IEP and therefore proposed an inappropriate education plan that was not updated to reflect B.S.'s progress since the year before. For these reasons, the Court concludes that the 2007-2008 IEP did not provide B.S. a FAPE.

The IHO and the SRO properly evaluated the 2006-2007 IEP but improperly imputed many of the same arguments to the 2007-2008 IEP. In that regard, they committed the same error as the school district. While the IHO and SRO found Ms. Mellon's observations and progress reports compelling, they erred in not crediting the

progress B.S. made at Maplebrook.  The Court must reverse their rulings on the grounds

that they failed to take into account important information about B.S. in formulating the

2007-2008 IEP.

### e.  Tuition reimbursement claim for 2007-2008 school year

The Court may require the school district reimburse parents for their expenditures

for private school educational services obtained for a student by the parents, if (1) the

services offered by the district were inappropriate, (2) the services selected by the parent

were appropriate, and (3) equitable considerations support the parent's claim.  *Sch.*

*Comm. of the Twn. of Burlington Mass. v. Dept. of Educ.*, 471 U.S. 359, 370 (1996).  The

parents will not be automatically barred from reimbursement if the private facility is not

approved by the State Education Department as a school for children with disabilities.

*Florence Co. Sch. Dist. Four v. Carter*, 510 U.S. 7, 11 (1993).  Parents are also not held

to the same strict standard of placement as are school districts, and the inability to place a

child in the least restrictive environment will not bar parental reimbursement.  *W.S. &*

*L.S. o/b/o C.S. v. Rye City Sch. Dist.*, 454 F.Supp.2d 134, 139 (S.D.N.Y. 2006) (citing

*M.S. v. Bd. of Educ. of City Sch. Dist. of Yonkers*, 231 F.3d 96, 105 (2d Cir. 2000)).

### 1.  The District's 2007-2008 IEP was inappropriate

The Court found above that the 2007-2008 IEP was inappropriate.  The Court

now considers the other two prongs: whether Maplebrook was appropriate for B.S. and

whether equitable considerations support the parents' claim.

### 2.  Maplebrook was appropriate to meet B.S.'s needs for the 2007-2008 school year

The IHO and SRO did not reach the question of whether Maplebrook was

appropriate for B.S.'s needs, therefore the Court makes a *de novo* finding.  A private

placement is proper under IDEA if the education provided in the private placement is reasonably calculated to enable the child to receive educational benefits. *Florence Co. Sch. Dist. Four*, 510 U.S. at 15. As the Second Circuit has stated:

> Parents who seek reimbursement bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate. .... Subject to certain limited exceptions, "the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement.... [T]he issue turns on whether a placement-public or private-is 'reasonably calculated to enable the child to receive educational benefits.' " *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 364 (2d Cir.2006) (quoting *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034 and identifying certain exceptions). A private placement meeting this standard is one that is "likely to produce progress, not regression." *Walczak*, 142 F.3d at 130 (internal quotation marks omitted).

*Gagliardo*, 489 F.3d at 112. However, academic success at the private placement alone is not sufficient. The Court must find that a preponderance of the evidence supports the finding that the placement at Maplebrook provided B.S. with education instruction specifically designed to meet his unique needs. *Gagliardo*, 489 F.3d at 115.

The Court has already marshaled evidence of B.S.'s social, emotional, and academic progress at Maplebrook. A review of the IEPs and progress reports shows a program that is attentive to B.S.'s needs and has found a way to accommodate his unique profile. While his scores indicate extremely low intellect and academic ability, the teachers are Maplebrook are seeing progress in core academic areas and have noted that B.S.'s main weakness, attention deficit, has improved in some settings. Reports from his math teacher show that there is still more progress that can be made, but overall B.S. is doing much better in classroom settings than his scores would imply.

Futhermore, Dr. Marc Weiler, a psychologist retained by the parents conducted an updated evaluation of B.S. using the WIAT test. His report, dated September 20, 2008,

was admitted into evidence at the hearing.  The results indicated an improvement in

B.S.'s word reading and reading comprehension scores above what would have been

expected.  (P-HH).  Dr. Weiler also states in his report that he believes B.S. could be

reading at a 6th grade level by the time he graduates from Maplebrook, which would open

up more vocational opportunities for B.S. and predicts his ability to live independently as

an adult.  (P-HH).

B.S. has also responded well to the RISE program and has developed socialization

skills that will improve his chances of holding down a job, avoid co-morbid psychiatric

conditions, having meaningful relationships, and living independently.  (Tr. 1264).  His

active participation in Maplebrook's sports programs have contributed to B.S.'s

development as well.  (E.S. Aff. ¶¶ 10-14).

Defendants disagree that B.S. demonstrated progress while at Maplebrook, but in

doing so, they undermine their own argument that Ms. Mellon's observations show that

B.S.'s progress while in the district's middle school.  The school district argues that

because B.S.'s test scores remained the same or were slightly worse after a year at

Maplebrook, B.S. made no progress.  However, the district takes a less test-centric view

when considering how B.S. fared in Ms. Mellon's classes.  There, the teacher's

observations indicate that B.S. progressed while his test scores did not improve.  The

Court finds that since both teacher observations and test scores are considered by the

school district in developing IEPs, it is fair for parents to also consider both in deciding if

a private placement is appropriate.  In this case, the qualitative information on B.S. shows

substantial progress, and there is some objective evidence as well that he has made slow

progress in certain academic areas.

Defendants also argue that Maplebrook is not the least restrictive environment because there are no non-disabled students. The Court recognizes that this factor alone does not bar a parent's claim for reimbursement because parents who unilaterally place their child will commonly place him or her in a private school that specializes in teaching children with disabilities. *Cleveland Heights Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 400 n. 7 (6th Cir. 1998). The right of parental placement would be vitiated if the courts were to find that such a private school placement violated IDEA's mainstreaming requirement.

Given B.S.'s social and academic needs, Maplebrook is the least restrictive environment because it provides him with an opportunity to interact with students who have a range of abilities and participate in activities that he is excluded from in the public school setting. For example, even though he is able to take general education P.E. classes, B.S. was unable to play on sports teams in the district because there is no provision for a student of his ability to join—at KLSD, there are try-outs and physical requirements for the teams that he cannot meet. (E.S. Aff. ¶¶ 35-38). Rather than learn in a very small class with students who are now significantly different from B.S. in terms of social and physical impairments, B.S. has shown he can succeed in a larger, more standard academic class with more opportunities for peer-learning. At the same time, Maplebrook offers the vocational training that has also been recommended for B.S.

The Court concludes that Maplebrook was an appropriate placement for B.S. for the 2007-2008 school year.

### 3. Equitable consideration support the parents' claim for reimbursement

If parents meet their burden, the district court enjoys broad discretion in

considering equitable factors relevant to fashioning relief. *See Florence County Sch. Dist. Four,* 510 U.S. at 16. Here, the Court considers the economic hardship that Plaintiffs have endured in placing B.S. in private school. (E.S. Aff. ¶¶ 6-7). The Court also considers that Plaintiffs were active participants in the CSE's process of developing their son's IEPs. While they strenuously defended their views, they did not impede the process or otherwise fail to cooperate. They provided the school district with testing information and documentation from Maplebrook to enable the development of an appropriate education plan. They included their experts in meetings to provide clear and reliable information to the CSE.

After reviewing the record, the Court does not agree with Defendant that the parents acted in bad faith in paying tuition to Maplebrook in June 29, 2007 before the school district had an opportunity to finalize the 2007-2008 IEP. The first meeting occurred on May 11, 2007 but was adjourned until testing from Maplebrook could be made available. In the meantime, the district did not consider or propose any alternative placements, or give serious consideration to keeping B.S. at Maplebrook. The parents accurately assessed that the district was unwilling to offer anything more than the IEP it had already designed the year before. The next meeting did not occur until August 2007, which would have been late to secure a private placement for B.S. Nevertheless, M.S. testified that she remained willing to consider a district placement, even as late as September 24, 2007 when she requested to observe Ms. Frasca's class. (Tr. 1768; SD-55). The Court finds that equitable considerations, such as the parents' efforts to participate in the district's process and the cost to them of a private placement, support their claim for reimbursement.

44

**IV. Conclusion**

The Court holds that because the 2006-2007 IEP provided B.S. a FAPE in accordance with IDEA, Plaintiffs are not entitled to reimbursement for the 2006-2007 school year. However, the Court holds that the 2007-2008 IEP did not provide B.S. a FAPE in accordance with the IDEA because it was not reasonably calculated to enable B.S. to meaningfully progress given his needs following the 2006-2007 school year. The Court overrules the IHO and SRO's decisions with respect to the 2007-2008 IEP and grants Plaintiffs' request for reimbursement for that school year. Accordingly, the parties' cross motions for summary judgment [dkt. nos. 29 and 35] are granted in part and denied in part. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

Dated: September 30, 2010

_Loretta A Preska_

LORETTA A. PRESKA,
Chief United States District Judge

45